## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

DAVID GRAY, JR.                                    )
                                                   )
*Plaintiff,*                                       )
                                                   )
v.                                                 )          **COMPLAINT**
                                                   )
STATE OF NEW HAMPSHIRE,                             )          **JURY TRIAL DEMAND**
DEPARTMENT OF TRANSPORTATION                        )
                                                   )          Civil Action No. _____
SUSAN KLASEN,                                       )
    NH DOT Director of Operations              )
                                                   )
KATHRYN NEWSOM,                                     )
    NH DOT Workers' Compensation Officer,      )
    NH DOT ADA Coordinator                     )
                                                   )
RYAN WORSMAN,                                       )
    NH DOT Assistant State                     )
    Maintenance Engineer                       )
                                                   )
JOHN CORCORAN,                                      )
    Former NH DOT Administrator,               )
    Bureau of Turnpikes                        )
                                                   )
ALAN HANSCOM,                                       )
    NH DOT State Maintenance Engineer          )
                                                   )
*Defendants.*                                      )

## JURY TRIAL DEMAND

    Plaintiff, Mr. David Gray, Jr., demands a jury trial on all claims so triable.

## INTRODUCTION

    1.    Despite their knowledge that David Gray, Jr. ("Mr. Gray") was a qualified individual with disabilities of post-traumatic stress disorder ("PTSD") and post-concussive syndrome, the Defendants moved Mr. Gray from a workspace that accommodated his needs to a workspace that triggered his disabilities and made it impossible for him to work a full day. As a

1

result, nearly every day that Mr. Gray attempted to work in his Hazen Drive cubicle he suffered an unbearable migraine and was forced to leave. After Mr. Gray requested accommodations to mitigate these symptoms, the Defendants failed to adequately accommodate his reasonable requests and, subsequently, retaliated against him by issuing a Corrective Action, a Letter of Warning, and failing to act on several of his leave requests.

2. Accordingly, Mr. Gray brings this action against the New Hampshire Department of Transportation ("NH DOT") as well as Susan Klasen, Kathryn Newsom, Ryan Worsman, John Corcoran, and Alan Hanscom ("the Individual Defendants"), in their Individual and Official Capacities, for their unlawful discriminatory practices in violation of Mr. Gray's rights under RSA § 354-A, the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654.

3. As outlined in the prayer of relief, Mr. Gray seeks equitable and injunctive relief requiring the Defendants to fully accommodate his reasonable requests and compensatory and enhanced compensatory damages for the pain, suffering, humiliation, and loss of enjoyment of life, and economic losses he has suffered as a result of the Defendants' willful and reckless conduct.

**PARTIES**

4. Plaintiff David Gray is an individual residing at 14 Red Chimney Rd., Warner, NH 03278, who works for NH DOT as a Winter Maintenance Program Specialist.

5. Defendant NH DOT is a state agency, under the direction of the Commissioner of Transportation, responsible for planning, developing, maintaining, and regulating the State's transportation network. RSA § 21-L:2. NH DOT primarily operates out of 7 Hazen Drive, Concord, NH 03301.

2

6.      Defendant Kathryn Newsom is the Workers' Compensation Officer and ADA Coordinator for NH DOT, which has a principal place of business of 7 Hazen Drive, Concord, NH 03301.

7.      Defendant Ryan Worsman is the Assistant State Engineer for NH DOT, which has a principal place of business of 7 Hazen Drive, Concord, NH 03301.

8.      Defendant John Corcoran is the Former Administrator of Turnpikes for NH DOT, which has a principal place of business of 36 Hackett Hill Road, Hooksett, New Hampshire 03106.

9.      Alan Hanscom is the State Maintenance Engineer for NH DOT, which has a principal place of business of 7 Hazen Drive, Concord, NH 03301.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over Plaintiff's federal claims because they arise under the laws of the United States.  *See* 28 U.S.C. § 1331.

11.      This Court has supplemental jurisdiction over Plaintiff's state law claims because such claims are part of the same case or controversy giving rise to Plaintiff's federal claims.  *See* 28 U.S.C. § 1367(a); *Kolackovsky v. Town of Rockport*, No. 25-1275, 2025 WL 171585, at *5 (1st Cir. Jan. 22, 2026).

12.      This Court has personal jurisdiction over the Defendants because Defendants are a state agency with a principal place of business in New Hampshire, and its officers, all of whom work in New Hampshire and have minimum contacts with this State.  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

13.      Venue is proper in this Court because the events or omissions giving rise to these claims occurred in New Hampshire.  *See* 28 U.S.C. § 1391.

3

## FACTS COMMON TO ALL CLAIMS

A.  *Mr. Gray's Employment with the State of New Hampshire and NH DOT*

14.    On February 2, 2004, Mr. Gray was hired by the State of New Hampshire.

15.    On January 10, 2014, Mr. Gray became employed by the NH DOT as a Transportation Control Officer.

16.    On or around January 1, 2016, Mr. Gray transitioned into the role of Winter Maintenance Program Specialist and remains employed in that position through the present.

17.    In his role, Mr. Gray works Monday through Friday from 6:30am to 2:30pm.

18.    On November 7, 2016, Mr. Gray was diagnosed with military-service-connected post-traumatic stress disorder ("PTSD").

19.    Mr. Gray also suffers from migraines that are triggered by light sensitivity as a result of post-concussive syndrome, which onset after his third and most recent concussion in September 2019.

B.  *Mr. Gray's Workspace at the Old Hooksett Turnpikes Building*

20.    In January 2016, Mr. Gray was transferred to the Hooksett Turnpikes Building, where he was assigned a closed-door office that he occupied himself.  The office was no more than 15 feet from the exit door, and allowed Mr. Gray to face the door when sitting at his desk.

21.    In March of 2019, Mr. Gray, along with the rest of the Hooksett Turnpikes staff, was transferred to a temporary office in Concord, NH.

22.    In the Concord temporary office, Mr. Gray was assigned a corner cubicle next to a window where he was situated approximately 15 feet away from an exit.

23.    In the Spring of 2020, Mr. Gray, along with other Hooksett Turnpikes employees, worked remotely due to Covid-19.

C. *Mr. Gray's Workspace at the New Hooksett Turnpikes Building*

24.     Around the Fall of 2021, Mr. Gray, along with other Hooksett Turnpikes employees, returned to work in the new Hooksett Turnpikes building, located at 36 Hackett Hill Road, Hooksett, New Hampshire 03106.

25.     Mr. Gray was allowed to pick from two available cubicles.  Mr. Gray picked the corner cubicle that was closest to an exit and had the fewest artificial lights, so as not to trigger his PTSD or migraines.

26.     After approximately one week of working in the new Hooksett Turnpikes building, Mr. Gray asked the Turnpikes Safety and Environmental Coordinator, John Sartorelli, if the one light he could see from his cubicle could be removed.

27.     Mr. Sartorelli said he would check with Sam Newsom, the Engineer in charge of the new Hooksett Turnpikes building, and about one day later the light was replaced with a non-functioning light, resolving the issue.

28.     Mr. Gray worked at the Hooksett Turnpikes Building for almost three years without any consistent triggers of his PTSD or migraines.

D. *NH DOT's Failure to Accommodate Mr. Gray at Hazen Drive*

29.     On July 26, 2024, Susan Klasen, NH DOT Director of Operations, told Mr. Gray he had to move into the Morton Building on Hazen Drive by the end of the next pay period.

30.     On July 30, 2024, Mr. Gray expressed his concerns about the move to Ms. Klasen and asked how to obtain reasonable accommodation for his disabilities.

31.     Shortly thereafter, Kathryn Newsom, NH DOT's Workers' Compensation Officer and ADA Coordinator, reached out to Mr. Gray regarding his disability accommodation request and sent him paperwork to complete.

32.    On July 31, 2024, Mr. Gray filed two requests for reasonable accommodation: one related to his post-concussive syndrome migraines and the other related to his PTSD.

33.    In his request for accommodation of his post-concussive syndrome, Mr. Gray requested overhead lighting within his view be turned off and that he be provided a cubicle with a window with blinds so he could work by natural light.  Mr. Gray noted that working in artificial lighting conditions gave him migraines that prevented him from doing his work.

34.    In his request for accommodation of his PTSD, Mr. Gray requested that his desk be situated with his back to the wall so he could see others approach, that he have a window, and that he be located as close as possible to an exit door.  Mr. Gray noted that these conditions helped abate his PTSD symptoms or ease them if they were triggered, and noted that his PTSD symptoms included severe anxiety, frustration, anger, and lack of focus.  Further, Mr. Gray noted how his prior workspace at the Old Hooksett Turnpikes building had adequately accommodated his PTSD.

35.    Mr. Gray additionally requested to be allowed to work remotely until his accommodations were in place.

36.    On August 5, 2024, Ms. Newsom asked Mr. Gray to provide a medical release or a doctor's note regarding his disabilities.

37.    Mr. Gray never signed a medical release.  Rather, he submitted a letter from his medical provider, Dr. Nicole Antinerella, which he provided to Ms. Newsom shortly thereafter.

38.    Upon information and belief, despite the fact that Mr. Gray did not sign a medical release, one of the Defendants contacted Dr. Antinerella to confirm the information submitted.

39.    On August 7, 2024, Ms. Newsom informed Mr. Gray that remote work would not be necessary because there was a desk in the Morton Building that accommodated his needs, and that he could begin working there the next day.

40.    In her August 7, 2024 communication, Ms. Newsom detailed how Mr. Gray's newly assigned desk and location would accommodate his requests.

41.    However, when Mr. Gray began to move his items to the Morton Building, he discovered his new cubicle did not meet his requested accommodations.

42.    Rather, Mr. Gray's cubicle was in a crowded area with fluorescent lighting that was overwhelming and would likely trigger his PTSD.

43.    Mr. Gray immediately informed his new supervisor, Ryan Worsman, Assistant State Maintenance Engineer, about the lack of accommodation.

44.    The next day, on August 8, 2024, Mr. Gray communicated to Ms. Newsom that his new workspace did not meet his needs and asked about alternative workspaces.

45.    Mr. Gray was told that his new cubicle was the only available workspace and that he could inform Alan Hanscom, State Maintenance Engineer, that Mr. Gray would work remotely until his new cubicle workspace could be adjusted.

46.    That same day, August 8, 2024, Mr. Gray's primary care provider, Dr. Nicole Antinerella, certified that Mr. Gray had a chronic serious health condition that began on October 4, 2019, would last a lifetime, and may require Mr. Gray to be absent from work daily if his requested accommodations were not met.

47.    Shortly thereafter, the Defendants approved Mr. Gray for intermittent FMLA leave to cover his unexpected absences due to migraines or PTSD symptoms.

48.    On August 9, 2024 and August 12, 2024, Mr. Gray worked remotely.

49.    On August 12, 2024, Ms. Newsom communicated to Mr. Gray that his new cubicle was ready after additional adjustments had been made to satisfy his needs.

50.    On August 13, 2024, Mr. Gray went into work, but discovered that the only changes

made to his cubicle was that his desk had been rotated so that he sat facing outward and the fluorescent lighting directly over his desk had been removed.

51.     However, his cubicle otherwise did not satisfy his needed accommodations.

52.     Specifically, seven overhead fluorescent lights were visible from his cubicle, which caused Mr. Gray to have a migraine around 7:15 a.m. that morning.

53.     Mr. Gray immediately communicated his concerns to Ms. Newsom.

54.     By 12:55 p.m., Mr. Gray's migraine had become unbearable, and he informed Ms. Newsom and Mr. Worsman that he had to leave.

55.     Mr. Gray left work that day shortly after 1:00 p.m.

56.     The next day, on August 14, 2024, no changes had been made to Mr. Gray's workspace.

57.     At approximately 8:01 a.m., Mr. Gray began to have a migraine.

58.     At approximately 10:00 a.m., as his migraine had worsened, Mr. Gray expressed his concerns to Mr. Worsman and informed him that he would likely have to leave early due to the migraine.

59.     In response, Mr. Worsman explained that the walls of Mr. Gray's cubicle could not be extended higher due to a fire code.

60.     At approximately 12:30 p.m., Mr. Gray left due to his migraine and other PTSD triggers, including a co-worker coming around the corner of Mr. Gray's cubicle and yelling "Boo!"

61.     Before he left, Mr. Gray showed Mr. Worsman his prior workspace in the Hooksett Turnpikes building, which Mr. Gray explained eased his PTSD and migraine symptoms.

62.     Mr. Gray explained to Mr. Worsman that, in his Hooksett Turnpikes workspace he: was located near an exit and, therefore, had a short escape route if needed; was placed in a corner

away from others and, therefore, was not overwhelmed with people traffic; was oriented to face the door and, therefore, not surprised by others; and had control over the artificial lights in his view and, therefore, was able to mitigate the onset of his migraines.

63.     On August 15, 2024, with no changes made to his cubicle or nearby artificial lighting, Mr. Gray created a temporary adjustment to his workspace in an effort to block the artificial lighting.

64.     Mr. Worsman forced Mr. Gray to remove the adjustment, even though Mr. Gray explained that it was meant to enable him to perform his work given the fact that he had been forced to leave the last two days with substantial migraines.

65.     After taking down the adjustment, Mr. Gray was again forced to leave work, this time at approximately 12:30 p.m., due to a substantial migraine, which he communicated to Ms. Newsom and Mr. Worsman.

66.     On August 16, 2024, with no further changes to his cubicle or the area lighting, Mr. Gray began to suffer from a migraine about one hour into his workday.

67.     Mr. Gray expressed his concerns to Ms. Klasen, who said she was going to let Ms. Newsom do her job and that she was not going to interfere.

68.     Ms. Klasen and Mr. Worsman then looked at Mr. Gray's cubicle and others in the office to see if they could figure something out, but no changes were made.  However, Ms. Klasen permitted Mr. Gray to work remotely 2 days per week.

69.     Mr. Gray then left work at approximately 10:00 a.m. due to his migraine.

70.     Throughout August 2024, Mr. Gray continued to come into work with no changes to either the lighting or his cubicle setup.

71.     In an effort to perform his job without migraines or PTSD symptoms, Mr. Gray

sometimes worked out of one of several empty conference rooms, instead of his assigned cubicle, on a temporary basis.

72.     However, on days he had to work at his cubicle, Mr. Gray had to leave work early due to migraines or other PTSD symptoms.

73.     On August 19, 2024, Ms. Newsom reached out to Mr. Gray regarding possible long-term accommodations and alternative workspaces.

74.     Around the same time, Mr. Gray informed Mr. Worsman that Ms. Klasen had permitted him two days of remote work, and Mr. Gray requested certain days of remote work from Mr. Worsman.

75.     Mr. Worsman responded that Mr. Gray would need Director approval for remote work and for flexibility on the days he requested.

76.     On August 20, 2024, Mr. Gray provided Mr. Worsman with the requested Workplace flexibility paperwork but was told that it was not consistent with what Highway Maintenance normally does and was otherwise "not good enough," and therefore Mr. Gray had to redo the request.

77.     On August 21, 2024, instead of providing Mr. Gray with a suitable workspace, Ms. Newsom suggested Mr. Gray wear a wide brimmed hat and light filtering glasses in the office to block the light.

78.     On August 22, 2024, Mr. Gray told Ms. Newsom that those accommodations would not meet his needs because hats put pressure on his head, making his migraines worse, and glasses cause static on his hearing aids.

79.     On August 23, 2024, Mr. Gray provided new workplace flexibility paperwork to Ms. Klasen.

80.    Ms. Klasen said she would speak with Mr. Worsman about Mr. Gray's request for remote work two days per week.

81.    On August 27, 2024, Ms. Newsom informed Mr. Gray that his previous set up at Hooksett Turnpikes was not a formal ADA accommodation, and that she believed he was currently being sufficiently accommodated.

82.    On August 29, 2024, Ms. Newsom told Mr. Gray that his use of the conference room was intended to be a short-term solution and that he could not book any additional conference rooms after the first week of October.  Ms. Newsom then asked for additional information regarding the medical documentation provided by Mr. Gray's physician, among other things.

83.    Since September 2024, no changes have been made to Mr. Gray's workspace at the Morton Building and, as a result, he has frequently been forced to leave work due to migraines and/or PTSD symptoms.

84.    To date, the NH DOT has provided the following accommodations, which in their totality have been inadequate to prevent Mr. Gray's migraines, PTSD symptoms, and loss of work time:

a.    Overhead light above Mr. Gray's cubicle and the neighboring cubicle were turned off;

b.    An additional cube panel was installed;

c.    Cube shields were provided to block additional light;

d.    Mr. Gray was assigned a corner cubicle and a corner piece was added to the cube to allow him to sit facing the walkway;

e.    Mr. Gray's cubicle was located "near" two exits;

f.    Mr. Gray's cubicle was located in a "low foot traffic" environment with limited

neighbors.

E. *Recommendations of Mr. Gray's Medical Providers*

85.    To further support his accommodation requests and to explain why the provided accommodations remain inadequate, Mr. Gray was seen by Dr. Nicole Antinerella, his primary care physician at Concord Hospital.

86.    Dr. Antinerella reviewed the accommodations provided by the Defendants to determine whether they were adequate.

87.    For the first accommodation of overhead lighting adjustment, Dr. Antinerella concluded that the accommodation of removing only the fluorescent light directly above Mr. Gray's desk and his neighbor's was insufficient because Mr. Gray could still see the other fluorescent lights in the room and the flickering contributed to his migraines.  Instead, Dr. Antinerella recommended relocation to an office where Mr. Gray would be entirely in control of the light he was exposed to.

88.    Dr. Antinerella further noted that the the Defendants' suggestion that Mr. Gray wear a wide brimmed hat or using light filtering glasses would not work and could worsen Mr. Gray's symptoms.

89.    For the second accommodation of allowing use of a corner desk against the wall, Dr. Antinerella agreed that the desk set up/positioning would be adequate to meet Mr. Gray's need to be facing outward so long as he was not facing other coworkers' desks and was able to see everyone walking by.

90.    However, Dr. Antinerella noted that the area outside of Mr. Gray's cubicle had become a gathering place for his coworkers.  Mr. Gray provided Dr. Antinerella with images showing how the table outside of Mr. Gray's cubicle is used as a snack table with a Keurig machine

next to it.  Dr. Antinerella concluded that these features, and the accompanying crowd, distractions, and noise, could trigger his PTSD symptoms.

91.    For the third accommodation of workspace near an exit, Dr. Antinerella determined that the accommodation was inadequate.  Dr. Antinerella noted that one of the activities that most helps to alleviate Mr. Gray's PTSD symptoms is the ability to walk outside alone and breathe fresh air, and the longer it takes for him to do that, the more likely he is to get distressed before he arrives outside.  Dr. Antinerella described that from Mr. Gray's current location, it takes him around four times the distance to get outside and address his PTSD symptoms than is effective.

92.    For the fourth and final accommodation of preventing unnecessary foot traffic, Dr. Antinerella reiterated how coworkers often congregate near Mr. Gray's desk because of the unofficial snack table and coffee making area, along with the gathering of coworkers to chat with his neighbors right outside of his cubicle.

93.    As a final recommendation, Dr. Antinerella noted that the best accommodation to resolve Mr. Gray's work needs would be assignment to an office with a door and a window so that he can control his own light and working environment.

94.    Rachel Vaughan, Mr. Gray's psychotherapist, also wrote an assessment of his provided accommodations.  Like Dr. Antinerella, Ms. Vaughan opined that Mr. Gray would benefit most from an office where he can control the light and type of light exposure without needing to worry about it impacting a shared space.  She noted that the proximity to gathering coworkers makes it difficult for Mr. Gray to focus especially given the hypervigilance associated with his PTSD and the strain imposed by his post-concussive syndrome related migraines.

95.    Dr. Vaughan emphasized the need for Mr. Gray to be able to exit an environment when he is feeling threatened and also recommended his coworkers provide advance notice before

coming around the corner into his space to prevent activating his PTSD symptoms.

96.     On October 10, 2024, after making no progress in obtaining his needed and reasonable accommodations, Mr. Gray filed a Charge of Discrimination through the New Hampshire Commission for Human Rights ("NHCHR").

97.     On October 24, 2024, the NHCHR notified the NH DOT of the charge.

98.     On January 2, 2025, Dr. Antinerella re-certified that Mr. Gray needed continued access to intermittent FMLA leave because he had a chronic serious health condition that began in 2016, would last a lifetime, and may require Mr. Gray to be absent from work daily if sufficient accommodations were not provided.

99.     Shortly thereafter, the Defendants authorized Mr. Gray's continued use of intermittent FMLA leave.

   F.   _Mr. Worsman's February 6, 2025 Performance Review and Corrective Actions_

100.    On February 6, 2025, Mr. Worsman performed an annual performance review of Mr. Gray.[1]

101.    While Mr. Worsman noted that Mr. Gray's regular use of FMLA leave often resulted in Mr. Gray missing meetings, and mandated other corrective actions for Mr. Gray to take, his overall summary of Mr. Gray's performance was that Mr. Gray met expectations, that his role was critical to the success of the Bureau, and that his knowledge base and expertise was valued.

102.    Among other things, Mr. Worsman noted in his performance review, "David's short notice on leave can make it challenging to plan around and results in missed meetings regularly."

---

[1] The February 6, 2025 Performance Review and Corrective Action states that it covers two years of Mr. Gray's work, from February 2, 2023 to February 6, 2025. Further the "Corrective Action Performance Summary" is dated "2/6/2024." Upon information and belief, this was an annual performance review solely for February 2024 through February 2025, and the Corrective Action Performance Summary was issued contemporaneously with the performance review on February 6, 2025.

103.    Further, Mr. Worsman noted as a corrective action that Mr. Gray needed to "Prioritize completing essential tasks and functions of the position such as presentations, meetings conducting training, and reporting."  (emphasis added).

G.  *NH DOT's Letter of Warning and Mr. Gray's Appeals*

104.    On March 3, 2025, Mr. Gray received a Letter of Warning from NH DOT, written by Mr. Hanscom and Mr. Corcoran.  The warning referenced Per 1002.04(b)(1), failure to meet any work standard; Per 1002.04(b)(3), unauthorized absences from work; and Per 1002.04(b), refusal to follow the legitimate directives of the supervisor.

105.    The Letter noted that Mr. Gray missed afternoon meetings on November 5, 2024 and December 18, 2024.

106.    On November 5, 2024, when Mr. Gray was alleged to have missed an afternoon meeting, Mr. Gray had left work at approximately 9:00 a.m. due to a migraine and utilized authorized intermittent FMLA leave to do so.

107.    Then, on December 18, 2024, Mr. Gray missed the meeting because he forgot, until he was prompted by a reminder on his phone, that he had a doctor's appointment scheduled that related to a surgery for which he had previously taken FMLA leave.

108.    Notably, Mr. Gray never confirmed that he would attend the December 18 meeting and multiple other people missed that meeting without receiving a write-up, including Mr. Hanscom, who co-issued the Letter of Warning to Mr. Gray.

109.    On March 14, 2025, the State Employees' Association of New Hampshire ("SEA") filed a Step I appeal of the Letter of Warning on Mr. Gray's behalf.

110.    On March 28, 2025, the NH DOT responded to and denied Mr. Gray's Step I Appeal.

111.    On April 7, 2025, the SEA filed a Step II Appeal.  In addition to outlining Mr. Gray's factual disputes, the SEA noted the illegality of holding Mr. Gray accountable for missing meetings when his absence was due to a valid FMLA entitlement.

112.    On May 5, 2025, the NH DOT responded to the Step II Appeal by rewriting the Letter of Warning but attempted to take away Mr. Gray's right to appeal and continued to tie the disciplinary action to Mr. Gray's absence from work.

113.    On May 15, 2025, the SEA filed a Step III Appeal.  The SEA noted that the NH DOT readily admitted in the Step II Appeal meeting that most of the Letter of Warning was not properly issued, and that it should be amended to only reflect concerns about his absence on December 18, 2024.

114.    On June 19, 2025, the NH DOT responded to the Step III Appeal, by again rewriting the Letter of Warning to remove anything unrelated to the December 18, 2024 incident in an effort to remove Mr. Gray's appeal rights.

115.    On July 2, 2025, the SEA filed a Step IV Appeal on Mr. Gray's behalf, which remains pending.

   H. *Mr. Gray's Grievances Regarding Leave Requests*

116.    On May 2, 2025, the SEA filed a grievance action on Mr. Gray's behalf, alleging that NH DOT was targeting Mr. Gray and ignoring his rights.  SEA alleged NH DOT did so by violating the SEA Collective Bargaining Agreement ("CBA") by failing to respond to Mr. Gray's leave requests within seven days, as required per Section 10.3(b) of the CBA and making improper criticisms of Mr. Gray's use of absences and their impact on Mr. Gray's work.

117.    On May 5, 2025, NH DOT responded to the letter and granted Mr. Gray's leave request.

118.    However, Mr. Gray continued to have several outstanding leave requests that remained pending beyond the approval time frame set forth in the CBA.

I.    _Ant Infestation at the Morton Building_

119.    On or around July 2, 2025, Mr. Gray arrived to work to a major ant infestation in the Morton Building, including on Mr. Gray's desk and in his cubicle.

120.    Mr. Gray is severely allergic to ant bites and other stinging insects and carries an epi pen for this purpose.

121.    Mr. Gray informed Mr. Worsman about the issue immediately, and he acknowledged that the DOT was aware of the ants but did not provide Mr. Gray with an option to work elsewhere due to his allergy.

122.    The ant infestation was substantial and was not resolved in a timely manner, so much so that the State Employee Union became involved.

123.    On September 23, 2025, Dr. Antinerella recommended that Mr. Gray go out on FMLA leave full time to better manage his stress and anxiety over the ongoing situation.

124.    On or around October 1, 2025, Mr. Gray left on that recommended full-time leave.

J.    _Charge of Discrimination_

125.    On July 14, 2025, Mr. Gray filed an amended charge of discrimination to encompass the retaliatory efforts by the State in attempting to take disciplinary action against Mr. Gray for absences caused by the State's failure to accommodate and protected by his intermittent FMLA leave.  _See_ **Exhibit A**.

126.    On November 18, 2025, the U.S. Department of Justice, Civil Rights Division issued Mr. Gray a Notice of Right to Sue letter.  _See_ **Exhibit B**.

**COUNT I**
**DISCRIMINATION/FAILURE TO ACCOMMODATE – RSA § 354-A:7, VII(a)**
**(Against NH DOT)**

127.    Mr. Gray fully incorporates all preceding paragraphs as if expressed directly herein.

128.    It is an unlawful discriminatory practice "[f]or any employer not to make reasonable accommodations for the known physical or mental limitations of a qualified individual with a disability who is an applicant or employee, unless such employer can that the accommodation would impose an undue hardship on the operation of the business of the employer." RSA § 354-A:7, VII(a).

129.    NH DOT is an "employer" within the meaning of the statute. RSA § 354-A:2, VII ("'Employer' shall include the state and all political subdivisions, boards, departments, and commissions thereof.").

130.    Mr. Gray is a qualified individual with a disability within the meaning of the statute. RSA § 354-A:2, XIV-a (defining such as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires . . .").

131.    When Mr. Gray joined the NH DOT in 2014, he informed the State that he was a disabled veteran.

132.    As early as the Fall of 2021, and at least since July 30, 2024, NH DOT knew that Mr. Gray was a qualified individual with a disability, including PTSD and post-concussive syndrome, and that he had physical or mental limitations, including but not limited to sensitivities to artificial light, crowded areas, a need to see others coming, and quick access to the outdoors to manage his PTSD symptoms.

133.    Despite NH DOT's knowledge of Mr. Gray's disabilities, his repeated requests for

18

accommodation and related communications, and his medical providers' explanations of why the initially-provided accommodations were insufficient, the NH DOT failed to accommodate Mr. Gray's disabilities by, *inter alia*, failing to provide him complete control over the artificial lighting within his view and with a workspace in a secluded area, in close proximity to an exit, and with a window so he could work under ambient light.

134.    Accordingly, NH DOT engaged in an unlawful discriminatory practice in violation of RSA § 354-A:7, VII(a).

135.    Further, given their knowledge of Mr. Gray's disabilities, his rights under RSA 354-A, and his medical providers' opinions that the provided accommodations were inadequate, the Defendants' conduct constitutes willful conduct or a reckless disregard for his rights.

136.    As a factual and proximate result of NH DOT's unlawful discriminatory practice, Mr. Gray has suffered substantial personal injuries including, but not limited to, severe and unnecessary pain due to migraines and PTSD symptoms, limitations in his ability to work, and loss and enjoyment of life, both at work and at home, and lost wages.

137.    Further, as a factual and proximate result of NH DOT's unlawful discriminatory practice, Mr. Gray was forced to utilize over 800 hours of various forms of leave time (including paid vacation and sick leave) and utilize his FMLA benefits when he otherwise would not have had to use such leave had he been reasonably accommodated.

138.    Given the value of such accrued leave time and the pension structure of the New Hampshire State Retirement System, NH DOT's failure to accommodate Mr. Gray resulted in his substantial financial and entitlement loss and, if such leave is not restored, may substantially diminish the value of his pension.

139.    Accordingly, Mr. Gray is entitled to equitable relief and compensatory damages.

## COUNT II
## RETALIATION – RSA § 354-A:19
### (Against All Defendants)

140.    Mr. Gray fully incorporates all preceding paragraphs as if expressed directly herein.

141.    It is an unlawful discriminatory practice for any person engaged in any activity to which [RSA § 354-A] applies to retaliate against any person "because he has opposed any practices forbidden under [RSA § 354-A] or because he has filed a complaint, testified or assisted in any proceeding under [RSA § 354-A]."  RSA § 354-A:19.

142.    NH DOT is a "person" within the meaning of the statute and, thus, is subject to retaliation claims under RSA § 354-A:19.  *See* RSA § 354-A:2, XIII (defining "Person" to include "the state and all political subdivisions, boards, and commissions thereof.").

143.    The Individual Defendants are "persons" within the meaning of the statute and, thus, are subject to retaliation claims under RSA § 354-A:19.  *See* RSA § 354-A:2, XIII (defining "Person" to include "one or more individuals . . .").

144.    Mr. Gray is a "person" within the meaning of the statute and, thus, is protected by the provisions of RSA § 354-A:19.  *See id.*

145.    As a result of the Defendants' failure to grant Mr. Gray his reasonable requests for accommodation, Mr. Gray continued to make requests for such accommodations, provided further explanation from his medical providers regarding why the accommodations the Defendants provided were insufficient, and further requested FMLA leave for the time he missed due to his frequent migraines.

146.    Rather than adequately accommodate Mr. Gray's reasonable requests, the Defendants retaliated against Mr. Gray by issuing him a Corrective Action, Letter of Warning, and instituting disciplinary action against him and otherwise failing to approve or act on his daily leave requests.

147.    Accordingly, the Defendants' conduct constitutes an unlawful discriminatory practice in violation of RSA § 354-A:19.

148.    Further, given their knowledge of Mr. Gray's disabilities, his rights under RSA 354-A, and his medical providers' opinions that the provided accommodations were inadequate, the Defendants' conduct constitutes willful conduct or a reckless disregard for his rights.

149.    As a factual and proximate result of the Defendants' unlawful discriminatory practice, Mr. Gray has suffered substantial personal injuries including, but not limited to, severe and unnecessary migraines and PTSD symptoms, limitations in his ability to work, and loss and enjoyment of life, both at work and at home, and lost wages due to the leave he was forced to use to cover his intermittent absences.

150.    Accordingly, Mr. Gray is entitled to equitable relief, compensatory damages, and enhanced compensatory damages. *See* RSA § 354-A:21-a.

### COUNT III
### AIDING AND ABETTING DISCRIMINATORY PRACTICES – RSA § 354-A
### (Against All Defendants)

151.    Mr. Gray fully incorporates all preceding paragraphs as if expressed directly herein.

152.    It is an unlawful discriminatory practice to aid, abet, incite, compel, or coerce another—or attempt to so aid, abet, incite, compel, or coerce another—to commit an unlawful discriminatory practice or obstruct or prevent any person from complying with New Hampshire's law against discrimination.    RSA § 354-A:2, XV(d); *see* RSA § 354-A:7, I; *Equal Emp. Opportunity Comm'n v. Fred Fuller Oil Co.*, 168 N.H. 606, 611-12 (2016).

153.    Both employers and individuals may be liable for aiding and abetting discrimination in the workplace. *Fred Fuller Oil Co.*, 168 N.H. at 611.

154.    By failing to make reasonable accommodations for Mr. Gray's known physical and mental limitations, and by retaliating against Mr. Gray for making requests for accommodation

and filing for FMLA leave, NH DOT engaged in the unlawful discriminatory practices as explained in Counts I and II above.

155.    By their own individual actions, Ms. Klasen, Ms. Newsom, Mr. Worsman, Mr. Corcoran, and Mr. Hanscom aided, abetted, incited, compelled, or coerced—or attempted to so aid, abet, incite, compel, or coerce—NH DOT to fail to accommodate Mr. Gray's reasonable requests.

156.    As early as the Fall of 2021, and at least by July 30, 2024, the Individual Defendants knew that Mr. Gray was a disabled person who could perform his job adequately with reasonable accommodation, knew that Mr. Gray requested reasonable accommodation to his workspace to mitigate the symptoms of his disabilities, and knew that Mr. Gray requested FMLA leave when no sufficient accommodations were provided.

157.    However, the Individual Defendants took actions that aided and abetted the NH DOT's unlawful discriminatory practices.

158.    Specifically, Ms. Klasen, as NH DOT Director, aided and abetted the NH DOT's unlawful discriminatory practices by, *inter alia*, forcing Mr. Gray to move to the Morton Building from the Hooksett Turnpikes Building where he was adequately accommodated and, upon Mr. Gray starting work at the Morton Building, failing to supervise the other Individual Defendants to ensure that Mr. Gray was provided reasonable accommodation for his disabilities including workplace adjustments and FMLA leave to cover disability-related absences.

159.    Specifically, Ms. Newsom, as NH DOT Health Safety Officer and ADA Coordinator, facilitated the NH DOT's unlawful discriminatory practices by, *inter alia*, failing to approve Mr. Gray's reasonable requests for accommodation, failing to timely approve Mr. Gray's daily leave requests, failing to provide Mr. Gray with adequate accommodation, suggesting that

Mr. Gray supply his own accommodations by means of wearing a wide-brimmed hat and light-filtering glasses, and by prohibiting Mr. Gray from working in other spaces that were better suited to his needs.

160.    Specifically, Mr. Worsman, as Assistant State Engineer, aided and abetted the NH DOT's unlawful discriminatory practices by, *inter alia*, failing to provide Mr. Gray with adequate accommodation despite his requests, forcing Mr. Gray to remove adjustments he made to his cubicle in an effort to mitigate his migraines, and unreasonably denying Mr. Gray's request for workplace flexibility.

161.    Specifically, Mr. Corcoran, as NH DOT Administrator of the Bureau of Turnpikes, aided and abetted the NH DOT's unlawful discriminatory practices by, *inter alia*, failing to ensure Mr. Gray was provided adequate accommodation for his disabilities and issuing a Letter of Warning and initiating disciplinary action against Mr. Gray in retaliation for Mr. Gray requesting reasonable accommodation and FMLA leave.

162.    Specifically, Mr. Hanscom, as NH DOT State Engineer, aided and abetted the NH DOT's unlawful discriminatory practices by, *inter alia*, issuing a Letter of Warning and initiating disciplinary action against Mr. Gray in retaliation for Mr. Gray requesting reasonable accommodation and FMLA leave.

163.    Accordingly, the Individual Defendants committed unlawful discriminatory practices pursuant to RSA § 354-A:2, XV(d).

164.    Further, given their knowledge of Mr. Gray's disabilities, his rights under RSA 354-A, and his medical providers' opinions that the provided accommodations were inadequate, the Defendants' conduct constitutes willful conduct or a reckless disregard for his rights.

165.    As a result of the Individual Defendants' unlawful discriminatory practice, Mr.

Gray has suffered substantial personal injuries including, but not limited to, severe and unnecessary migraines and PTSD symptoms, limitations in his ability to work, and loss and enjoyment of life, both at work and at home.

166.    Accordingly, Mr. Gray is entitled to equitable and injunctive relief, compensatory damages, and enhanced compensatory damages. *See* RSA § 354-A:21-a.

**COUNT IV**
**FAILURE TO ACCOMMODATE – ADA**
**(Against Individual Defendants in their Official Capacities)**

167.    Mr. Gray fully incorporates all preceding paragraphs as if expressed directly herein.

168.    A plaintiff may bring a Title I ADA claim against a state official or officer in his or her official capacity. *See Parsons v. N.H. Dep't of Health and Hum. Srvs.*, Case No. 23-cv-415-SM-TSM, 2024 WL 2747367, at *3-4 (D.N.H. May 29, 2024).

169.    To establish a claim for failure to accommodate, a plaintiff must produce sufficient evidence for a reasonable jury to find that: (1) he was disabled within the meaning of the ADA; (2) he was a "qualified individual;" and (3) the defendant did know of the plaintiff's disability but failed to reasonably accommodate it. *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 31 (1st Cir. 2019); *see also* U.S.C. § 12112(5)(A).

170.    Under the ADA, a "disability" is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment . . ." 42 U.S.C. § 12102(1).

171.    Mr. Gray's PTSD and post-concussive syndrome constitute disabilities under the ADA.

172.    Under the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that

such individual holds or desires." 42 U.S.C. § 12111(8)).

173.    Mr. Gray is a qualified individual with respect to his employment with NH DOT.

174.    Notably, Mr. Worsman's February 6, 2025 evaluation of Mr. Gray noted that he met expectations, that his role was critical to the success of the Bureau, and that his expertise was valued.

175.    As early as the Fall of 2021, and at least as of July 30, 2024, the Individual Defendants knew of Mr. Gray's disabilities.

176.    Despite the Individual Defendants' knowledge of Mr. Gray's disabilities, and despite Mr. Gray's repeated requests for accommodation and related communications, the Individual Defendants, in their official capacities, failed to accommodate Mr. Gray's disabilities by, among other things, failing to provide him complete control over the artificial lighting within his view and by failing to provide him with a workspace in a secluded area, in close proximity to an exit, and with a window so he could work with ambient light.

177.    Accordingly, Mr. Gray is entitled to appropriate equitable and injunctive relief.

**COUNT V**
**RETALIATION – ADA**
**(Against Ms. Klasen, Newsom, Mr. Corcoran, and Mr. Hanscom, in their Official Capacities)**

178.    Mr. Gray fully incorporates all preceding paragraphs as if expressed directly herein.

179.    To prove a claim of retaliation under the ADA, a plaintiff must establish that (1) he engaged in protected conduct; (2) he experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. *Freadman v. Metro. Prop. and Cas. Inc. Co.*, 484 F.3d 91, 106 (1st Cir. 2007).

180.    Mr. Gray engaged in protected conduct by requesting accommodation for his disabilities and by voicing his concerns regarding the Defendants' failure to provide such

accommodation.

181.    Mr. Gray then experienced an adverse employment action when Ms. Newsom and/or Ms. Klasen denied Mr. Gray's requests for accommodation and Mr. Corcoran and Mr. Hanscom issued Mr. Gray a Letter of Warning.

182.    There is a causal connection between Mr. Gray's protected conduct and the adverse employment action he experienced demonstrated by, *inter alia*, the temporal proximity of the issuance of the Letter of Warning to Mr. Gray's accommodation requests and related communications, and that the proffered reasons for the Letter of Warning—largely complaints about Mr. Gray missing meetings—were merely pretext, given that: as recently as February 6, 2025, Mr. Worsman recognized Mr. Gray's expertise in his work and noted that his work met expectations; that other individuals missed meetings without being written up; that Mr. Hanscom also missed the December 18, 2024, was not written up, and yet wrote David up for missing the meeting; and that, even if Mr. Gray did miss some meetings, he had a valid excuse as he missed them for disability-related or medical reasons.

183.    Accordingly, Ms. Klasen, Newsom, Mr. Corcoran, and Mr. Hanscom unlawfully retaliated against Mr. Gray in violation of the ADA.

184.    Accordingly, Mr. Gray requests injunctive relief in the form of a court order, ordering the named Defendants to withdraw the Letter of Warning, expunge any record of the Letter of Warning, and cease disciplinary action related to Mr. Gray's decision to exercise his rights under the ADA.

### COUNT VI
### INTERFERENCE – FMLA
### (Against Individual Defendants in their Official Capacities)

185.    Mr. Gray fully incorporates all preceding paragraphs as if expressed directly herein.

186.    "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [FMLA]." 29 U.S.C. § 2615(a)(1).

187.    To prove a claim of FMLA interference, a plaintiff must show that he was entitled to FMLA leave, which the employer disputes. *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331 (1st Cir. 2005).

188.    The NH DOT granted Mr. Gray's ability to take intermittent FMLA leave.

189.    However, despite Mr. Gray submitting requests for FMLA leave, submitting FMLA certifications from his primary care provider, Dr. Antinerella, in August 2024, and again in December 2024, and otherwise demonstrating his entitlement to FMLA leave at those times, Mr. Worsman and Mr. Hanscom, in their official capacities, failed to timely approve, or otherwise act on, Mr. Gray's daily FMLA leave requests, therefore interfering with his use of his approved FMLA intermittent leave.

190.    Accordingly, Mr. Gray is entitled to appropriate equitable and injunctive relief.

### COUNT VII
### RETALIATION – FMLA
### (Against Ms. Klasen, Mr. Corcoran, and Mr. Hanscom)

191.    Mr. Gray fully incorporates all preceding paragraphs as if expressed directly herein.

192.    To make a claim for FMLA retaliation, a plaintiff must show that "(1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998).

193.    Beginning in August 2024, Mr. Gray requested intermittent FMLA leave because his post-concussive syndrome migraines and PTSD imposed serious medical conditions that

prevented him from performing his job.

194.    At some point between August 2024 and January 2025, Mr. Gray's intermittent FMLA leave was approved.

195.    Mr. Gray took intermittent FMLA leave during this period and continued to do so when his migraines prevented him from performing his duties.

196.    Mr. Gray then suffered an adverse employment action when Ms. Klasen, Mr. Corcoran, and/or Mr. Hanscom decided to issue Mr. Gray a Letter of Warning on March 3, 2025.

197.    There is a causal connection between Mr. Gray's protected activity of requesting and taking FMLA leave and the issuance of the Letter of Warning given the temporal proximity of the issuance of the Letter of Warning and Mr. Gray's frequent use of FMLA leave during the months of January, February, and March 2025, and that the proffered reasons for the Letter of Warning—largely complaints about Mr. Gray missing meetings—were merely pretext, given that: as recently as February 6, 2025 Mr. Worsman recognized Mr. Gray's expertise in his work and noted that his work met expectations; that other individuals missed meetings without being written up; that Mr. Hanscom also missed the December 18, 2024, was not written up, and yet wrote David up for missing the meeting; and that, even if Mr. Gray did miss some meetings, he had a valid excuse as he missed them for disability-related or medical reasons.

198.    Accordingly, Mr. Gray is entitled to appropriate equitable and injunctive relief.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests this Court:

A.    Schedule this matter for trial by jury, and after trial;

B.    Find for the Plaintiff on each count;

C.    Issue equitable and injunctive relief by Ordering the Defendants to:

28

1.  Provide Mr. Gray with an office of his own, within 15 feet of an exit door, with a door and a window or, alternatively, a cubicle in a less trafficked area, within 15 feet of an exit door, next to a window, and with the ability to see persons who approach him and control all visible overhead lights;

2.  Rescind the February 6, 2025 Performance Review and Corrective Action issued to Mr. Gray and expunge all related records from all personnel files in which they appear, regardless of the location or form of their storage or, alternatively, append a correction in each place where any such record appears;

3.  Rescind the March 3, 2025 Letter of Warning issued to Mr. Gray and expunge all related records from all personnel files in which it appears, regardless of the location or form of their storage or, alternatively, append a correction in each place where any such record appears;

4.  Restore Mr. Gray's lost entitlements, including but not limited to all paid and unpaid leave and FMLA benefits he exhausted as a result of the Defendants' failure to accommodate his disabilities;

5.  Approve any pending FMLA leave that Mr. Gray is or was entitled to at the time of submission; and,

6.  Cease disciplinary action related to Mr. Gray's decision to exercise his rights under RSA 354-A, the ADA, and/or FMLA.

D.  Award Plaintiff with compensatory damages including but not limited to, all lost wages, lost employment benefits, lost future earning capacity, loss of retirement income;

E.      Award Plaintiff compensatory damages for Plaintiff's pain and suffering, emotional distress, humiliation, inconvenience, and loss of enjoyment of life;

F.      Award Plaintiff enhanced compensatory damages for Defendant's willful or reckless conduct;

G.      Award Plaintiff his reasonable attorney's fees, interests, and costs;

H.      Award Plaintiff all other damages available at law; and

I.      Award Plaintiff such other relief as this Court deems equitable and just.

Respectfully Submitted,
DAVID GRAY, JR.

By His Attorneys,
SHAHEEN & GORDON, P.A.

Dated: February 13, 2026

*/s/ Olivia F. Bensinger*
Olivia F. Bensinger, Esq. NH Bar# 274145
Ryan P. Garrette, Esq. NH Bar #273437
107 Storrs Street
P.O. Box 2703
Concord, NH 03302-2703
(603) 225-7262
obensinger@shaheengordon.com
rgarrette@shaheengordon.com